STERLING DRUG, INC., Petitioner,

v.

FEDERAL TRADE COMMISSION,
Respondent.

No. 83–7700.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted May 15, 1984.

Decided Aug. 28, 1984.

Lionel Kestenbaum, Howard Adler, Jr., Bergson, Borkland, Margolis, & Adler, Washington, D.C., for petitioner.

Melvin H. Orlans, Regional Counsel, F.T.C., Washington, D.C., for respondent.

Before WRIGHT, HUG, and NELSON, Circuit Judges.

HUG, Circuit Judge:

In this appeal from a decision of the Federal Trade Commission, Sterling Drug, Inc. seeks review of a determination that it disseminated false advertising for its non-prescription analgesic products. Sterling contests findings by the Commission that its advertising was deceptive. It contends that the provisions of the cease and desist order are not warranted by the record and that the order applies to more of Sterling's

products than is warranted by the record. We uphold the findings and enforce the order.

I

### Facts and Procedural History

Sterling Drug, Inc. ("Sterling") manufactures nonprescription internal analgesic products, including Bayer Aspirin, Bayer Children's Aspirin, Vanquish, Cope, and Midol. In February 1983, the Federal Trade Commission issued an administrative complaint against Sterling in which it was alleged that certain Sterling advertisements violated sections 5 and 12 of the Federal Trade Commission Act, 15 U.S.C. §§ 45 and 52. On the same day, the Commission also charged that two of Sterling's competitors had engaged in deceptive advertising practices. Those complaints named Bristol-Myers Company, which manufactures Bufferin and Excedrin, and American Home Products Corporation, which produces Anacin and Arthritis Pain Formula.

The cases were partially consolidated before an administrative law judge, who held joint hearings on issues common to the three cases. After extensive pretrial discovery, the ALJ held a separate hearing in this case in 1979–80. He heard testimony from forty witnesses, including experts in the fields of medicine, pharmacology, and advertising. He also reviewed hundreds of exhibits and a large volume of scientific publications submitted in conjunction with the testimony of the expert witnesses.

The ALJ found each of the companies liable for violations of the Act and issued broad cease and desist orders barring future violations. Each of the companies appealed to the Commission. In each case, the Commission affirmed the ALJ's decision as modified.[1]

In considering Sterling's appeal, the Commission reviewed a complaint against Sterling that charged deceptive advertising as to several of its products. Briefly summarized, the charges made by the complaint and the holdings reached by the Commission are as follows:

### A. Advertising for Bayer Aspirin.

1. The complaint charged that Sterling had advertised that it was scientifically established that Bayer Aspirin had overall pharmaceutical superiority to other brands and that it was also pharmaceutically superior as to four specific attributes: purity, freshness, stability, and speed of disintegration.

The Commission held that the Government had not met its burden of proof on the charge that a study done by Sterling on overall pharmaceutical quality did not demonstrate Bayer's superior quality. However, the Commission held that Sterling's scientific study did not establish superior pharmaceutical quality as to the four specific attributes.

2. The complaint charged that Sterling had represented that Bayer's therapeutic effectiveness had been established by scientific means.

The Commission found that the representation had been made in the advertising and that the claim was not supported by scientifically acceptable evidence.

3. The complaint charged that advertising represented that Bayer relieved nervous tension, stress, fatigue, and depression and that there was no reasonable basis for the claim.

The Commission held that the advertising did not make this representation.

### B. Advertising for Cope.

1. The complaint charged that advertising falsely claimed that Cope had a unique formula that acted as a powerful pain reliever and as a gentle relaxer.

The Commission found that the advertising made the representation and that

---

1. The Commission's order in *American Home Products* was enforced as modified in *American Home Products Corp. v. F.T.C.,* 695 F.2d 681 (3d Cir.1982). In *Bristol-Myers Co.,* enforcement of the Commission's order was also granted on appeal. *See Bristol-Myers Co. v. F.T.C.,* 738 F.2d 554 (2d Cir.1984).

there was no reasonable support for the claim that the formula was unique.

2. The complaint charged that advertising represented that Cope relieved nervous tension, stress, fatigue, and depression and that its effectiveness was established.

The Commission found that the representation was made and that there was no reasonable support for the claim.

### C. Advertising for Midol.

1. The complaint charged that advertising represented that Midol did not contain aspirin as its analgesic agent whereas, in fact, it did.

The Commission found that a false representation had been made.

2. The complaint charged that advertising represented that Midol relieved nervous tension, stress, fatigue, and depression.

The Commission found that the representation was made and that there was no reasonable support for the claim. Sterling does not challenge this finding on appeal.

### D. Advertising for Vanquish.

1. The complaint charged that Sterling claimed that Vanquish was superior to other products as a pain reliever and caused less stomach upset than other products and that this claim was scientifically established.

The Commission found that Sterling had represented that Vanquish was superior as to these qualities and that there was no reasonable basis for the claim, but the Commission also found that Sterling had not claimed that superiority was scientifically established.

### E. Advertising for Bayer Children's Aspirin.

1. The complaint charged that Sterling had represented that its children's aspirin had superior therapeutic effectiveness to other products.

The Commission found that there had been no such representation.

The Commission entered a cease and desist order, which is set forth in Appendix A. All portions of the order covered the following Sterling products: Bayer, Bayer Children's Aspirin, Vanquish, Cope, Midol, or other nonprescription internal analgesic products. Paragraph IV of the order also covered all of Sterling's nonprescription drug products. The order set forth the criteria that must be met before Sterling can claim that superior therapeutic effectiveness or pharmaceutical quality has been established scientifically. The order also set forth the standard to be met for these products where claims of therapeutic performance are made but no claims are made that such performance has been scientifically established. The order prohibited Sterling from representing that one of its products has an unusual or special ingredient when the ingredient is commonly used in other similar products. The order also restricted Sterling from representing that the analgesic agent is an ingredient different from aspirin when, in fact, it is aspirin.

## II

### Liability Determinations

### A. Standard of Review

■ In reviewing the Commission's liability determinations, we apply the standard of review set out in 15 U.S.C. § 45(c): the Commission's factual findings, "if supported by evidence, shall be conclusive." This standard requires such relevant evidence as a reasonable mind might accept as adequate to support the conclusion. *Litton Industries, Inc. v. F.T.C.*, 676 F.2d 364, 368 (9th Cir.1982). Thus the reviewing court may not reweigh the evidence, but must accept the findings of the Commission, if supported by substantial evidence in the record as a whole. *See American Home Products Corp. v. F.T.C.*, 695 F.2d 681, 686 (3d Cir.1982).

The term "deceptive practices" states a legal standard, the ultimate determination of which remains with the courts; however, the Supreme Court has held that the Commission's judgment that a practice is decep-

tive is to be given great weight. The Court stated:

> This statutory scheme necessarily gives the Commission an influential role in interpreting § 5 and in applying it to the facts of particular cases arising out of unprecedented situations. Moreover, as an administrative agency which deals continually with cases in the area, the Commission is often in a better position than are courts to determine when a practice is "deceptive" within the meaning of the Act. This Court has frequently stated that the Commission's judgment is to be given great weight by reviewing courts. This admonition is especially true with respect to allegedly deceptive advertising since the finding of a § 5 violation in this field rests so heavily on inference and pragmatic judgment. Nevertheless, while informed judicial determination is dependent upon enlightenment gained from administrative experience, in the last analysis the words "deceptive practices" set forth a legal standard and they must get their final meaning from judicial construction.

*F.T.C. v. Colgate-Palmolive Co.*, 380 U.S. 374, 385, 85 S.Ct. 1035, 1042–43, 13 L.Ed.2d 904 (1965) (citations omitted).

### B. *Discussion*

In its examination of the complaint, the Commission distinguished three distinct types of advertising claims. The first type, establishment claims, suggests that a product's superiority has been scientifically established. An advertiser may make this type of representation through the use of specific language, such as "medically proven," or through the use of visual representations.

The second type of claim is a representation that suggests the product is superior without claiming that superiority has been scientifically established. The claimed superiority may refer to therapeutic efficacy or may describe the product's pharmaceutical attributes, such as freshness, purity, color, and shelf life. The Commission requires that the advertiser have a reasonable basis to support a claim of product superiority.

The third type of claim is puffing. These claims are either vague or highly subjective, *e.g.,* "Bayer works wonders," and therefore no substantiation of the claim is required.

### 1. *Findings Concerning Bayer Aspirin Advertisements*

### a. *Establishment of Pharmaceutical Claims*

The complaint charged Sterling had claimed that Bayer's overall pharmaceutical superiority to other brands had been established and that Bayer's superiority as to certain specific pharmaceutical attributes had also been established. Sterling contended it was entitled to make such claims because of an in-house study it conducted in 1971 that compared Bayer to 220 other brands of plain 5-grain aspirin. The study evaluated thirty pharmaceutical characteristics. Sterling contended the study established both Bayer's overall pharmaceutical superiority to all other brands and its superiority with regard to the four specific attributes listed in the Commission's order. The Commission agreed that the Government had not carried its burden of proof because it did not show the aspirin comparison study was inadequate support for a claim of overall pharmaceutical superiority. However, after analyzing the test results on specific attributes and the expert testimony evaluating those results, the Commission determined the study did not support Sterling's claims as to those individual qualities.

■ Sterling's first argument on this issue is that, viewed as a whole, the advertisements claimed only that Bayer had overall pharmaceutical superiority, but made no specific claim of superior freshness, purity, or stability. It relies on the testimony of its expert, Dr. Miles, who concluded these individual attributes were "buried" in the advertisements and would not be noticed by consumers. The Commission apparently rejected the expert testimo-

ny because it believed the claim of superiority of individual attributes was clear on the face of the advertisements. It cited as an example a print advertisement that stated "Bayer tested its aspirin against every other leading brand. For purity, stability, speed of disintegration, Bayer was consistently better." The inference that this advertisement claimed better purity, stability, and speed of disintegration is not unreasonable. The Commission was careful to distinguish advertisements that asserted only overall quality. We therefore reject Sterling's contention.

Alternatively, Sterling argues the Commission misconstrued the test results and ignored the testimony of its experts. The Commission's analysis as to each attribute, however, weighs the testimony of the experts and reveals the basis for the Commission's conclusions. This court may not redetermine the weight to be given Sterling's evidence. *Corn Products Refining Co. v. F.T.C.*, 324 U.S. 726, 739, 65 S.Ct. 961, 967, 89 L.Ed. 1320 (1945); *Safeway Stores, Inc. v. F.T.C.*, 366 F.2d 795, 800 (9th Cir.1966), *cert. denied,* 386 U.S. 932, 87 S.Ct. 954, 17 L.Ed.2d 805 (1967). We therefore affirm the conclusion that these claims were deceptive.

b. *Establishment of Therapeutic Superiority*

■ The Commission determined that several advertisements for Bayer Aspirin represented the product to be therapeutically superior and claimed that superiority had been scientifically established. Sterling first contends that those advertisements, read as a whole, merely claimed Bayer's pharmaceutical superiority, not its therapeutic superiority. Its second contention is that there was no establishment claim.

The Commission's conclusions were based largely on its own reading of the advertisements. It observed that the advertisements referred to the product's "quality" without limiting or explaining that term. Because the Commission thought that consumers' primary concern

was effective pain relief, it assumed that consumers would understand a representation of quality as a promise of therapeutic superiority. "[T]he ads speak in such sweeping terms about quality that a consumer could reasonably infer that the [aspirin comparison] tests measured Bayer in all respects, including efficacy."

Sterling insists this analysis ignores the findings of the ALJ, who found consumers could distinguish drug quality claims from drug performance claims. The Commission did not reject this finding. However, it held that specific advertisements would lead consumers away from distinguishing pharmaceutical from therapeutic claims because the broad language used suggested that "quality" included the attribute of effectiveness. This was especially found to be true in advertisements that also referred to pain relief or to speed of disintegration, which consumers might view as a therapeutic attribute. For these reasons, the Commission agreed with the ALJ that the advertisements made therapeutic claims.

Sterling claims the Commission improperly rejected the testimony of Dr. Miles, an expert in advertising and marketing. She testified that quality was a concept that was recognizable to consumers and that would not be confused with therapeutic effectiveness. She also stated, however, that consumers did not devote mental energy to interpreting Bayer advertisements and would not "rationally process advertising communications." The Commission did not ignore this testimony. Instead, it viewed it as evidence that, given a broad general representation of "quality," consumers would not attempt to analyze the components of quality. If the representation were so broad as to include an inference of efficacy, consumers would not consider whether any limitation had been placed on the term. This was particularly true of advertisements that, in addition to claiming "quality," claimed aspirin was a superior pain reliever to combination products.

Among the items of evidence presented to the ALJ were "copy tests" designed to measure viewer reaction to advertisements. The tests had surveyed viewers of two Bayer advertisements and found 11 percent of the viewers of one advertisement received an efficacy message and 13 percent of the viewers of the second advertisement received such a message. The ALJ partially accepted these test results and held they supported the conclusion that certain Bayer advertisements conveyed a message of therapeutic superiority. The Commission rejected this evidence. It found that the test methodology was flawed, that the percentages were too small to be significant, and that the tests on which the ALJ relied conflicted with other copy test evidence. Sterling now argues the Commission impermissibly ignored this evidence.

■ The Commission can determine whether evidence is reliable and competent. *See Resort Car Rental System, Inc. v. F.T.C.*, 518 F.2d 962, 963 (9th Cir.) (per curiam), *cert. denied*, 423 U.S. 827, 96 S.Ct. 41, 46 L.Ed.2d 42 (1975). It explained fully why it disagreed with the ALJ's appraisal of this evidence. *Cf. Cinderella Career & Finishing Schools, Inc. v. F.T.C.*, 425 F.2d 583, 589 (D.C.Cir.1970) (Commission may not reverse ALJ's determinations without stating reasons for doing so). We therefore do not agree that this evidence was ignored.

The Commission held it did not need to consider whether Sterling had a reasonable basis to claim Bayer was therapeutically superior, since in every case Sterling had also claimed that Bayer's therapeutic superiority was scientifically established. It concluded that Sterling lacked the substantiation to make these establishment claims. The Commission held that establishment claims could be substantiated only if Ster-

ling relied upon two well-controlled clinical studies that indicated Bayer was superior.[2]

Sterling refutes the conclusion that it made establishment claims, arguing that the text of its advertisements made no explicit assertion that Bayer's therapeutic superiority was established. However, the Commission's conclusions were based upon visual aspects of the advertisements, rather than only on the text. These visual representations included pictures of medical and scientific reports from which consumers could infer that Bayer's effectiveness had been objectively evaluated. The Commission noted that the advertisements conveyed a "serious tone" or a "scientific aura" that also implied scientific approval of the product.

■ A determination of false advertising can be based upon deceptive visual representations. *Standard Oil Co. of California v. F.T.C.*, 577 F.2d 653, 659 (9th Cir. 1978); *see American Home*, 695 F.2d at 688. It is within the Commission's expertise to determine what inferences consumers may draw from such representations. *See Simeon Management Corp. v. F.T.C.*, 579 F.2d 1137, 1146 & n. 11 (9th Cir.1978); *Resort Car*, 518 F.2d at 964. We defer to that expertise and affirm the conclusion that Bayer was advertised to have scientifically established therapeutic superiority.

■ Sterling also challenges the conclusion that its establishment claims were not substantiated. It contends its in-house study comparing aspirin brands established Bayer's superior therapeutic efficacy. It therefore questions the requirement that it rely on two well-controlled clinical tests to support its advertising claims. Sterling concedes that clinical studies are necessary to compare the therapeutic effects of different drugs or of different dosages of the same drug. It argues, however, that physi-

**2.** The Commission described the required tests as follows:

In a well-controlled clinical test, drugs are tested on real patients having actual symptoms. It is not disputed in this case that the elements of a well-controlled clinical test are the use of an appropriate pain model, replica-

tion of results, experienced unbiased investigator and adequately trained personnel, a written protocol, double-blinding, use of a placebo control, use of appropriate predetermined analytical techniques, and statistical and clinical significance of the results.

cians and scientists would not require clinical studies to determine the comparative therapeutic efficacy of identical drugs and dosage forms. Sterling maintains that a therapeutic judgment comparing brands of the same drug could be based on pharmaceutical and other non-clinical data. It therefore insists that its aspirin comparison study, which tended to demonstrate Bayer's pharmaceutical superiority, provided a reasonable basis to claim established therapeutic superiority.

The ALJ was provided extensive evidence on this issue, including testimony of several experts in various medical and pharmaceutical specialties and scientific literature. He took quite a narrow view of which of these items of evidence were to be accorded substantial weight. He accorded more weight to the testimony of experts specifically experienced in the comparison of mild analgesics. Sterling argues vigorously that the ALJ's evaluation of the evidence ignored substantial portions of the expert testimony. It stresses that a decision that ignores competent evidence cannot be supported by substantial evidence, citing *Cinderella Career & Finishing Schools*, 425 F.2d at 589.

We do not agree that the ALJ ignored Sterling's experts. His voluminous findings summarize each expert's testimony and evaluate the weight to be given it based on its relevance and the expert's experience. The Commission relied on the ALJ's evaluation of the evidence when it held that "it is the consensus of the experts with experience in comparing analgesic efficacy who testified in this proceeding that at this time well-controlled clinical tests are necessary to establish the comparative superiority of one brand of aspirin over others." This is not equivalent to a finding that no evidence supported Sterling's position. It merely signifies that the Commission agreed with the ALJ's resolution of the evidentiary conflict. Because we cannot reweigh the evidence, we affirm the Commission's conclusion.

### 2. Findings Concerning Cope

#### a. Uniqueness Claims

Cope, which Sterling marketed as a remedy for nervous tension headaches, contained aspirin, caffeine, and methapyrilene fumarate, an antihistimine included to induce drowsiness. The Commission held this formula was falsely represented to be unique in advertisements such as this:

> Cope looks different, is different. Besides a powerful pain reliever, Cope gives you a gentle relaxer. The others don't .... A unique formula for really effective relief of nervous tension headache. And you get it only in Cope.

The representation was held to be false because a Bristol-Myers product, Excedrin P.M., also contained aspirin and methapyrilene fumarate. The Commission found that the misrepresentation was material because it discouraged consumers from comparing the two products.

Sterling maintains the Cope formula was unique because Cope was the only product on the market designed for daytime relief of tension headaches. It contends Excedrin P.M. was not intended for the same use as Cope; Excedrin's larger dose of methapyrilene fumarate made it appropriate only for nighttime use. Sterling argues that, unlike Cope, Excedrin P.M. was intended as a sleeping aid.

■ We agree with the Commission that the Cope advertisements made clear and broad claims of uniqueness that were in no way limited to Cope's intended use as a daytime remedy. Because consumers would not have been led to distinguish Cope from Excedrin P.M., the representation of uniqueness was deceptive.

#### b. Establishment of Therapeutic Claims

■ Sterling does not contest the Commission's conclusion that it made therapeutic efficacy claims as to Cope. However, it claims these representations did not include the assertion that Cope's superiority was established.

The Commission based its conclusion on the visual aspects of advertisements for Cope. It cited as an example a television advertisement in which an announcer discussed Cope's efficacy in conjunction with his description of "important studies" on pain relief. The announcer held a copy of the "important studies." In the background were shelves lined with "ponderous books." We agree with the Commission that the combination of the visual and oral representations was apt to convey to consumers a message of proven efficacy.

The Commission found Sterling could not substantiate its claim that Cope's therapeutic efficacy was established. Sterling does not challenge that finding on appeal.

### 3. *Findings Concerning Midol*

The complaint charged Sterling with failing to disclose Midol's aspirin content. The Commission held that a mere failure to disclose the presence of aspirin in advertising for aspirin-based analgesics was not misleading. It concluded, however, that it was a deceptive practice to disseminate advertising that implied aspirin-based products did not contain aspirin. It found that certain Midol advertisements did create that impression, and it illustrated its finding with this radio advertisement:

> Midol starts to work fast with an exclusive formula that helps stop periodic pain ... and its medically approved ingredients give effective relief from headache and low backache. All in all, Midol's unique formula gets you through those days in comfort.

The Commission concluded that the term "exclusive formula" conveyed the message that Midol's analgesic ingredient was not aspirin. It also criticized an advertisement that claimed Midol was made from an "exclusive formula with medication ordinary pain relievers don't give you."

■ The failure to disclose material information may cause an advertisement to be deceptive, even if it does not state false facts. *Simeon Management*, 579 F.2d at 1145; *see also Bristol-Myers Co. v. F.T.C.*, 738 F.2d 554, at 563 (2d Cir.1984). We

must reject Sterling's contention that these advertisements were not intended to suggest that Midol's analgesic ingredient was unique. The illustrative advertisements specifically state that the unique ingredient relieves pain. We agree with the Commission that consumers could easily infer the unique pain reliever was something other than ordinary aspirin.

### III

### *Validity of the Order*

#### A. *Standard of Review*

■ Under the Federal Trade Commission Act, the Commission has the primary responsibility for determining the remedy for deceptive advertising. *See F.T.C. v. National Lead Co.*, 352 U.S. 419, 429, 77 S.Ct. 502, 509, 1 L.Ed.2d 438 (1957). Because of the Commission's expertise in determining what remedy is required to eliminate an unfair or deceptive practice, the Commission is granted wide latitude in deciding the scope of its orders. *Jacob Siegel Co. v. F.T.C.*, 327 U.S. 608, 612–13, 66 S.Ct. 758, 760–61, 90 L.Ed. 888 (1946). In drafting the Act, Congress recognized that "there is no limit to human inventiveness in [the advertising] field." *F.T.C. v. Sperry & Hutchinson Co.*, 405 U.S. 233, 240, 92 S.Ct. 898, 903, 31 L.Ed.2d 170 (1972) (quoting H.R.Conf.Rep. No. 1142, 63d Cong., 2d Sess., 19 (1914)). Accordingly, it authorized the Commission to draft orders encompassing all of an advertiser's products or all products in a broad product category in order to "fence in" known violators of the Act. *See National Lead*, 352 U.S. at 431, 77 S.Ct. at 510; *Litton*, 676 F.2d at 370. "Fencing-in provisions serve to 'close all roads to the prohibited goal, so that [the FTC's] order may not be by-passed with impunity.'" *Id.* (quoting *F.T.C. v. Ruberoid Co.*, 343 U.S. 470, 473, 72 S.Ct. 800, 803, 96 L.Ed. 1081 (1952)).

■ In reviewing the Commission's order, we must bear in mind its broad powers and its expertise in protecting consumers. We may not "lightly modify" the Commission's orders. *Colgate-Palmolive*, 380 U.S.

at 392, 85 S.Ct. at 1046; *F.T.C. v. Cement Institute,* 333 U.S. 683, 726, 68 S.Ct. 793, 815, 92 L.Ed. 1010 (1948). Our inquiry is limited to the determinations that the order is sufficiently clear and precise to give notice to the advertiser and that its scope bears a reasonable relation to the advertiser's violations of the Act. *Colgate-Palmolive,* 380 U.S. at 392, 394–95, 85 S.Ct. at 1046, 1047–48; *Litton,* 676 F.2d at 369, 370.

In *Sears, Roebuck and Co. v. F.T.C.,* 676 F.2d 385 (9th Cir.1982), we explored in depth the factors that indicate whether there is a reasonable relationship between the violation and the scope of the order. We observed that the "ultimate question is the likelihood of the petitioner committing the sort of unfair practices [the order] prohibit[s]." *Id.* at 391 (quoting *Litton,* 676 F.2d at 370). We outlined the elements on which a forecast of future violations may be based: (1) the deliberateness of the violation; (2) the violator's past record with respect to advertising practices; and (3) the adaptability or transferability of the unfair practice to other products. *Id.* at 392. We concluded that no single factor was determinative, but that the "more egregious the facts with respect to a particular element, the less important it is that another negative factor be present." *Id.*

■ In reviewing the Commission's order in the *American Home* case, the Third Circuit applied our analysis in *Sears, Roebuck.* Because of the nature of the products involved, the court believed it should also consider the seriousness of potential violations of the order. *American Home,* 695 F.2d at 706. It concluded that the health risks and potential adverse side effects associated with aspirin made this a unique product category. *Id.* at 698. The court also considered the fact that it is difficult for consumers to compare analgesic products effectively, so they are more likely to give credence to advertising claims. *Id.* We agree with the Third Circuit's conclusion that "[w]hen drug advertising is at issue, the potential health hazards may well justify a more sweeping

order than would be proper were the Commission dealing with a less consequential area." *Id.* at 706. We therefore add the seriousness of potential violations to our analysis under *Sears, Roebuck.*

B. *Discussion*

1. *Paragraph I of the Order*

■ Paragraph I outlines the means by which Sterling must substantiate a claim that the therapeutic superiority of any of its nonprescription internal analgesic products is established. The order requires that such claims be supported by two well-controlled clinical studies, and it sets out the procedures under which such studies must be conducted. Section D of the paragraph authorizes an alternate method of establishing a claim of therapeutic superiority, permitting Sterling to disseminate a claim that cannot be verified by two well-controlled clinical studies, but which is supported by a test or investigation that is generally accepted by the relevant scientific community as sufficient to establish the claim.

Sterling contends this paragraph is impermissibly broad. It argues that, at the least, the order should apply only to the two products, Bayer and Cope, as to which Sterling advertised established therapeutic superiority. We agree with the Commission that the scope of the paragraph is appropriate.

The violation was deliberate. The deceptive advertisements incorporated text, tone, and visual aspects intended to subtly persuade consumers that Bayer and Cope's therapeutic superiority had been scientifically established. These advertisements were widely disseminated for a period of several years.

The Commission found that Sterling did have a past history of violations, including an order litigated in 1950 regarding false claims that Bayer had been endorsed by a pharmacists' group. Sterling's record with the Commission also included four consent decrees involving non-analgesic products.

Applying the third *Sears, Roebuck* factor, the Commission found this practice to be readily transferable. It reasoned that if the order were limited to Bayer and Cope, Sterling could easily use the same subtle advertising devices to suggest that another internal analgesic had proven therapeutic superiority. Sterling would be free to change the name of one of its products and thereby avoid the order's restrictions.

We believe any future violation of this nature would be serious and should therefore be prevented. These advertisements convey a strong message to consumers— that doctors and scientists endorse the product—and do so in a manner so intentionally subtle that consumers are unlikely to analyze the message they receive.

We reject Sterling's contention that the requirement of two well-controlled clinical tests is unduly burdensome. The order sets out precisely the procedures to be followed; there is no question of adequate notice to Sterling. The Commission responded to Sterling's argument that the scientific community would not demand such studies by permitting an alternate means of supporting its claims. Furthermore, Sterling's argument that these requirements are burdensome ignores the obvious. If it prefers not to undertake the burden of establishing the truth of its claims, it need only refrain from claiming its products have been proven to be superior.

## 2. *Paragraph II of the Order*

Paragraph II regulates establishment claims as to the pharmaceutical quality of any of Sterling's nonprescription internal analgesic products. It is specifically limited to claims that any such product has superior purity, freshness, stability, or speed of disintegration. The level of support required for these claims is more lenient than that imposed in Paragraph I. Sterling is required to possess and rely on scientific evidence that would satisfy relevant experts as reliable.

■ Sterling believes this paragraph must be vacated because its establishment claims as to pharmaceutical attributes were made only about Bayer and there is no evidence it will make such claims about Bayer or any other internal analgesic in the future. We disagree. The violation was deliberate; the advertisements made explicit factual statements that consumers were likely to view as verified. *See Sears, Roebuck,* 676 F.2d at 393; *American Home,* 695 F.2d at 697. Although the challenged claims were made only as to Bayer, it is clear that these claims are easily adaptable for use in other Sterling advertisements. This paragraph is narrowly drawn, referring only to four specific attributes, and is reasonably related to the violation. It will therefore be enforced.

## 3. *Paragraph III of the Order*

■ Paragraph III requires Sterling to have a reasonable basis to support therapeutic performance claims for any of its nonprescription internal analgesic products. "Reasonable basis" is defined in the order as "competent and reliable scientific evidence."

Sterling asks us to vacate this paragraph as too vague. It relies upon *American Home,* in which the court held that an identical reasonable basis requirement was too vague and imprecise to give the advertiser sufficient notice of the standard. *American Home,* 695 F.2d at 710–11. The Commission's decision in *American Home* had acknowledged that the requirement of competent and reliable scientific evidence was intended to be flexible. The Commission refused to equate the requirement with the well-controlled clinical tests standard, stating instead it would determine the standard on a case-by-case basis. *Id.* at 710. The reviewing court found that the imprecision of this standard was exacerbated by the order's overbreadth. The advertiser had made only one comparative efficacy claim, but was subjected to an order covering all of its nonprescription drug products. The court concluded the combination of overbreadth and imprecision required it to deny enforcement of that section of the order. *Id.* at 711.

The Commission again applied the "competent and reliable scientific evidence" standard in this case and in *Bristol-Myers.* In the explanation of its order, however, it attempted to make the standard more precise. It described the standard as requiring more support than the usual reasonable basis test, but less than that required for establishment claims. It recognized that this left "some ambiguity" regarding the minimum acceptable level of support, but observed that submission of two clinical studies would always be sufficient. It concluded that the flexibility inherent in the standard set "an appropriate balance between the need for clear standards and the need to prevent repeated violations."

We agree with the Second Circuit's conclusion that *American Home* should be distinguished. *See Bristol-Myers,* at 560–61. As in *Bristol-Myers,* the order here is not overbroad, but is limited to the product category in which a violation occurred. Sterling does not contest the Commission's determination that it made therapeutic efficacy claims as to Cope, Vanquish, and Midol. The Commission also found such claims were made as to Bayer. Sterling's pattern of transferring this deceptive practice from one product to another is therefore clear.

With the Commission's explanation of its intent, this section of the order is probably "as specific as the circumstances will permit." *Colgate-Palmolive,* 380 U.S. at 393, 85 S.Ct. at 1047. In view of the extent of Sterling's violations and of the fact that violations were transferred from one product to another, it is appropriate that Sterling bear any risk that results from the standard's imprecision. *Id.* If Sterling prefers to continue to advance claims of therapeutic efficacy, it can reduce its risk of violating the order in one of several ways. First, it can support its therapeutic efficacy claims with two well-controlled clinical studies. Second, it can secure from the Commission an advisory opinion as to the propriety of proposed advertising. *See id.* at 394, 85 S.Ct. at 1047. Third, it can advise consumers that its claims of thera-

peutic efficacy are not clearly established. *See American Home,* 695 F.2d at 695.

We conclude that this portion of the order is sufficiently clear and precise, and it will be enforced.

### 4. *Paragraph IV of the Order*

Paragraph IV proscribes dissemination of advertising that claims or implies that a product contains any special, unusual, or unique ingredient when that ingredient is used in other nonprescription products intended for the same use. This paragraph is the broadest section of the order. It covers all nonprescription drugs manufactured by Sterling, approximately 36 products.

Sterling contends there is no basis for such a broad order. It argues the Commission's finding that it had made deceptive claims of ingredient uniqueness was based only on two Cope advertisements that had limited distribution.

The Commission emphasized that this violation was deliberate. It relied on evidence that Sterling was aware when it made its uniqueness claims that a Bristol-Myers product, Excedrin P.M., had the same ingredients as Cope. Despite this knowledge, Sterling made the specific factual representation that Cope's ingredients were unique.

The transferability of this practice also influenced the Commission. In view of the ease with which Sterling could claim any of its products is composed of unique ingredients, we agree that there is significant potential for serious future violations. Claims of this type deceive consumers as to the product's contents and defeat consumer efforts at product evaluation and comparison. They therefore encourage unnecessary use of a potentially hazardous product. *See Bristol-Myers,* at 564; *American Home,* 695 F.2d at 707.

Although the product category covered by this section is broad, the proscription is narrow and explicit. Because a very specific type of advertising claim is barred, the burden on Sterling is not onerous. The

deliberateness of the violation and the serious implications of its transferability convince us that a broad order is warranted. This paragraph will therefore be enforced.

### 5. *Paragraph V of the Order*

 Paragraph V prohibits Sterling from falsely representing that an aspirin-based product is different from aspirin and from misrepresenting the analgesic ingredient of any product. This section bars Sterling from creating the impression that the analgesic ingredients in its products are different from those in competing products. It also proscribes advertisements that contrast with aspirin the ingredient in an aspirin-based analgesic, without disclosing the aspirin content of the Sterling product. This paragraph covers all of Sterling's non-prescription internal analgesic products.

Sterling argues this section is irrationally broad because its violation was de minimus. We agree with the Commission, however, that this violation was serious for two reasons. First, misleading consumers who cannot tolerate aspirin is a grave concern. Second, consumers who did not know Midol's analgesic ingredient was aspirin might not question Midol's comparatively high retail price.

Moreover, the Commission carefully tailored this section of the order. The ALJ's proposed order would have required Sterling to disclose the presence of aspirin in any advertisement for an aspirin-based analgesic. The Commission rejected this requirement, holding Sterling has no affirmative duty to announce its products' aspirin content. Instead, the duty imposed by the Commission's order is that Sterling refrain from creating the false impression that a product does not contain aspirin.

Finally, Sterling argues that it has been forthright in revealing the aspirin content of Cope and Vanquish and that this indicates the violation will not be transferred to other products. If it is in fact Sterling's policy to disclose its products' aspirin content, this section of the order will not be burdensome. It is closely tailored to the practice actually committed by Sterling and

is a necessary and appropriate means of protecting consumers. Paragraph V will therefore be enforced.

The Commission's order is ENFORCED.

### Appendix A
### ORDER

#### I

**IT IS ORDERED** that Sterling Drug, Inc., its successors and assigns, and its officers, agents, representatives and employees, directly or through any corporation, subsidiary, division or other device, in connection with the advertising, offering for sale, sale or distribution of "Bayer Aspirin," "Bayer Children's Aspirin," "Vanquish," "Cope," "Midol," or other nonprescription internal analgesic product, in or affecting commerce, as "commerce" is defined in the Federal Trade Commission Act, do forthwith cease and desist from:

Making any representation, directly or by implication, that a claim concerning the superior effectiveness of such product has been established or proven unless such representation has been established by two or more adequate and well-controlled clinical investigations, conducted by independent experts qualified by training and experience to evaluate the comparative effectiveness of the drugs involved, on the basis of which it could fairly and responsibly be concluded by such experts (1) that the drug will have the comparative effectiveness that it is represented to have, and (2) that such comparative effectiveness is demonstrated by methods of statistical analysis, and with levels of confidence, that are generally recognized by such experts. The investigations shall be conducted in accordance with the procedures set forth below.

At least one of the adequate and well-controlled clinical investigations to evaluate the comparative effectiveness of the drug shall be conducted on any disease or condition referred to, directly or by implication, or, if no specific disease or condition is referred to, then the adequate and well-controlled clinical investi-

gations shall be conducted on at least two conditions or diseases for which the drug is effective. The clinical investigations shall be conducted as follows:

A. The subjects must be selected by a method that:

1. Provides adequate assurance that they are suitable for the purposes of the investigation, and the diagnostic criteria of the condition to be treated (if any);

2. Assigns the subjects to the test groups in such a way as to minimize bias; and

3. Assures comparability in test and control groups of pertinent variables, such as age, sex, severity or duration of disease or condition (if any), and use of drugs other than test drugs.

B. The investigations must be conducted double-blind, and methods of double-blinding must be documented. In addition, the investigations shall contain a placebo control to permit comparison of the results of use of the test drugs with an inactive preparation designed to resemble the test drugs as far as possible.

C. The plan or protocol for the investigations and the report of the results shall include the following:

1. A clear statement of the objective of the investigation;

2. An explanation of the methods of observation and recording of results, including the variables measured, quantitation, assessment of any subject's response and steps taken to minimize bias on the part of the subject and observer;

3. A comparison of the results of treatments or diagnosis with a control in such a fashion as to permit quantitative evaluation. The precise nature of the control must be stated and an explanation given of the methods used to minimize bias on the part of the observers and the analysts of the data;

4. A summary of the methods of analysis and an evaluation of data derived from the study, including any appropriate statistical methods.

D. A test or investigation which is not conducted in accordance with these procedures may be used to establish a claim only if respondent can show that, notwithstanding the failure to satisfy these procedures, the test or investigation would still be generally accepted by the relevant scientific community as sufficient to establish the truth of the claim.

## II

**IT IS FURTHER ORDERED** that respondent Sterling Drug, Inc., a corporation, its successors and assigns, and its officers, agents, representatives and employees, directly or through any corporation, subsidiary, division or other device, in connection with the advertising, offering for sale, sale or distribution of "Bayer Aspirin," "Bayer Children's Aspirin," "Vanquish," "Cope," "Midol," or any other nonprescription internal analgesic product, in or affecting commerce, as "commerce" is defined in the Federal Trade Commission Act, do forthwith cease and desist from making any representation, directly or by implication, that the superior freshness, purity, stability, or speed of disintegration of such product has been established, demonstrated, or proven unless at the time such representation is made, respondent possesses and relies upon competent and reliable scientific evidence which would permit qualified experts to conclude that the product has the comparative pharmaceutical qualities it is represented to have.

## III

**IT IS FURTHER ORDERED** that respondent Sterling Drug, Inc., its successors and assigns, and its officers, agents, representatives and employees, directly or through any corporation, subsidiary, division or other device, in connection with the advertising, offering for sale, sale or distribution of "Bayer Aspirin," "Bayer Chil-

dren's Aspirin," "Vanquish," "Cope," "Midol" or any other nonprescription internal analgesic, in or affecting Commerce, as "commerce" is defined in the Federal Trade Commission Act, do forthwith cease and desist from making any therapeutic performance claim for such product unless respondent possesses a reasonable basis for making that claim. A reasonable basis for such a claim shall consist of competent and reliable scientific evidence supporting that claim. Well-controlled clinical tests conducted in accordance with the criteria set forth in Order Paragraph I shall be deemed to constitute a reasonable basis for a claim.

## IV

**IT IS FURTHER ORDERED** that respondent Sterling Drug, Inc., its successors and assigns, and its officers, agents, representatives and employees, directly or through any corporation, subsidiary, division or other device, in connection with the advertising, offering for sale, sale or distribution of "Bayer Aspirin," "Bayer Children's Aspirin," "Vanquish," "Cope," "Midol," or any other nonprescription drug product in or affecting commerce, as "commerce" and "drug" are defined in the Federal Trade Commission Act, do forthwith cease and desist from making any representation, directly or by implication that such product contains any unusual, special or unique ingredient or ingredients when such ingredient or ingredients are commonly used in other nonprescription drug products intended for the same use or uses as the product advertised by respondent.

## V

**IT IS FURTHER ORDERED** that respondent Sterling Drug, Inc., its successors and assigns, and its officers, agents, representatives and employees, directly or through any corporation, subsidiary, division or other device, in connection with the advertising, offering for sale, sale or distribution of "Bayer Aspirin," "Bayer Children's Aspirin," "Vanquish," "Cope," "Midol," or any other nonprescription internal

analgesic in or affecting commerce, as "commerce" is defined in the Federal Trade Commission Act, do forthwith cease and desist from falsely representing that the analgesic ingredient in an aspirin-containing product is different from aspirin or otherwise misrepresenting the identity of any analgesic ingredient. It shall be a violation of this paragraph to contrast the analgesic ingredient of a product which contains aspirin with the analgesic ingredient of another product if that product also contains aspirin, unless respondent discloses clearly and conspicuously that the analgesic ingredient in its product is aspirin.

## VI

**IT IS FURTHER ORDERED** that respondent Sterling Drug, Inc., shall notify the Commission at least thirty (30) days prior to any proposed change in the corporation such as a dissolution, assignment or sale resulting in the emergence of a successor corporation, the creation or dissolution of subsidiaries or any other change in its corporation which may affect compliance obligations under this Order.

## VII

**IT IS FURTHER ORDERED** that the respondent herein shall within sixty (60) days after service of this Order upon it and at such other times as the Commission may require, file with the Commission a written report setting forth in detail the manner and form in which it has complied or intends to comply with this Order.