CINDERELLA CAREER AND FINISH-
ING SCHOOLS, INC., Stephen Corpo-
ration, Vincent Melzac, Petitioners,

v.

FEDERAL TRADE COMMISSION,
Respondent.

No. 22624.

United States Court of Appeals,
District of Columbia Circuit.

Argued Oct. 23, 1969.

Decided March 20, 1970.

Mr. Alan Y. Cole, Washington, D.C., with whom Messrs. Isaac N. Groner and William Kanter, Washington, D. C., were on the brief, for petitioners.

Mr. Gerald Harwood, Atty., Federal Trade Commission, with whom Mr. Karl H. Buschmann, Atty., Federal Trade Commission, was on the brief, for respondent.

Before TAMM, MacKINNON and ROBB, Circuit Judges.

TAMM, Circuit Judge:

This is a petition to review orders of the Federal Trade Commission which required petitioners Cinderella Career College and Finishing Schools, Inc. (hereinafter Cinderella), Stephen Corporation (the corporate entity which operates Cinderella), and Vincent Melzac (the sole owner of the stock of Cinderella and Stephen Corporation), to cease and desist from engaging in certain practices which were allegedly unfair and deceptive.[1]

After the Commission filed its complaint under section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45 (1964), which charged Cinderella with making representations and advertising in a manner which was false, misleading and deceptive, a hearing examiner held a lengthy series of hearings which consumed a total of sixteen days; these proceedings are reported in 1,810 pages of transcript. After the Commission had called twenty-nine witnesses and the petitioners twenty-three, and after the FTC had introduced 157 exhibits and petitioners 90 (Petitioners' Brief at 7), the hearing examiner ruled in a ninety-three page initial decision that the charges in the complaint should be dismissed.[2]

Complaint counsel appealed the hearing examiner's initial decision to the full Commission; oral argument was heard on the appeal on May 28, 1968 (Opinion of the Commission at 2), and the Commission's final order was issued on October 10, 1968. The full Commission reversed the hearing examiner as to six of the original thirteen charges and entered a cease and desist order against the petitioners, who then brought this appeal. For the reasons which follow we remand to the Commission for further proceedings.

We are faced with two principal issues on this appeal: whether the action of the Commission in reversing the hearing examiner comports with standards of due process, and whether then Chairman Paul Rand Dixon should have recused himself from participation in the review of the initial decision due to public state-

1. The Commission's complaint alleged that advertising used by petitioners contained the following false representations:
    1. Petitioners make educational loans to students who register for courses at the Cinderella Career and Finishing School.
    2. School Services, Inc. is a government or public nonprofit organization that has officially approved the Cinderella School or its courses.
    2. Dianna Batts, "Miss U.S.A. 1965," and Carol Ness, "Miss Cinderella 1965," were graduates of the Cinderella School and owe their success to the courses they took there.
    4. and 5. Petitioners offer courses of instruction which qualify students to become airline stewardesses and buyers for retail stores.
    6. Petitioners find jobs for their students in almost all cases through their job placement service.
    7. Graduates of petitioners' courses are qualified to assume executive positions.
    8. Cinderella Career and Finishing School is the official Washington, D.C., headquarters for the Miss Universe Beauty Pageant.
    9. Cinderella Career College and Finishing School is a college.

    The complaint also alleged that the following practices were deceptive:
    10. Prospective students who visit petitioners' school are frequently led to believe that they will be qualified to compete in certain beauty contests if they sign up for courses.
    11. Petitioners frequently add that completion of their courses will enable applicants in most cases to obtain better jobs.
    12. Prospective students are subjected to constant pressure to persuade them to enroll in petitioners' courses.
    13. Petitioners fail to disclose the nature of the commitments the students are expected to assume or to provide them with sufficient time or opportunity to read and consider them. (App. 5–7.)

2. The hearing examiner concluded that:
    Complaint counsel had failed to prove by a preponderance of reliable, probative and substantial evidence that the acts and practices alleged in the complaint to be deceptive, or any of such acts and practices, did and do constitute deceptive acts and practices which are proscribed by the Federal Trade Commission Act.
    (Initial Decision at 93.)

ments he had previously made which allegedly indicated pre-judgment of the case on his part.

## I. PROCEDURAL IRREGULARITY AND DUE PROCESS

As we have indicated above, the hearing on the complaint against petitioners was exhaustive. The important question raised by petitioners here is whether the full Commission, in reviewing an initial decision, may consider the advertisements de novo, disregarding entirely the evidence adduced at a lengthy hearing, and arrive at independent findings of fact and conclusions of law, or whether the Commission is bound by its own rules and regulations, as well as concepts of due process, to review the conclusions of the hearing examiner in light of the evidence.

■ In their final decision the Commissioners first criticized the hearing examiner for his handling of some of the testimony, stating that "[f]rom the initial decision it appears that the examiner ignored some of this testimony and some of it was given little or no weight because the examiner either questioned the credibility of the witness or considered their testimony hearsay." (Opinion of the Commission at 4.) The Commissioners themselves then proceeded to ignore all testimony completely: "[I]n view of our decision to independently analyze—and

without assistance from consumer or other witnesses—the challenged advertisements and their impact * * * *it becomes unnecessary to review the testimony of these expert and consumer witnesses.*" (*Id.* at 6; emphasis added.) Later in the opinion they again noted that "for the reasons stated above *the Commission will rely on its own reading and study of the advertisements to determine whether the questioned representation has the capacity to deceive.*" (*Id.* at 13; emphasis added.) The hearing examiner in a Federal Trade Commission proceeding has both the right and duty to make determinations concerning the credibility of witnesses and the exclusion of hearsay evidence; while the Commissioners may review those determinations on appeal, in light of the record, they may not choose to ignore completely the testimony adduced at the hearing.[3]

A further example of the Commissioners' determination to make a de novo review of the advertisements rather than considering the record as developed during the hearing is the statement that:

A review of the examiner's initial decision has persuaded the members of the Commission *to examine firsthand and independently* the challenged representations contained in respondents' advertisements rather than relying on the analysis thereof contained in the initial decision.[4]

---

3. It is clear that what the Commissioners did here was to review selected parts of the record (the advertisements) while ignoring other matters of record (the testimony of consumer and expert witnesses). We have noted elsewhere in this opinion (see text at 587–589 *infra*) that a reviewing court is required to review the entire record on appeal in determining whether the substantial evidence rule is met; we think that requirement is equally applicable to an agency reviewing the findings of its trial examiner. While the Commissioners may arrive at a different conclusion from the examiner and may thus overturn his decision, they may not do so in conformity with the concept of due process unless they have at their disposal as full an appreciation of all of the evidence as the

person whose decision they are overturning.

4. Counsel for the respondent has attempted to refute the allegation that the Commission relied on its own reading of the advertisements as the basis for its decision by arguing that "[i]n face of the Commission's pronouncement that it did review the entire record * * *, Cinderella's claim that the Commission * * * arbitrarily passed over the consumer and expert testimony * * * is plainly without merit." Brief for Respondent at 16. The statement on page two of the Findings of Fact that the entire record had been reviewed in making the determination to vacate and set aside the initial decision is not sufficient to validate the procedure adopted here.

(Opinion of the Commission at 4; emphasis added.) Not only do we find this conduct on the part of the Commissioners a violation of their own rules and hence of due process, but we also seriously question their ability to make the determination called for without the aid of the testimony in the record. It should be noted that the advertisements here in question are directed at a specific, narrow part of the public—teenage girls who are recent high school graduates and who do not intend to pursue their formal education in college. While it may be true that some advertisements are so glaringly misleading that anyone can recognize that fact, we think it could only benefit the ultimate determination if the Commissioners had before them the testimony both of experts on youth and of teenage girls themselves, in addition to their own reading of the statements alleged to be misleading. While they might initially decide that a given statement had the capacity to mislead, perhaps testimony of experts and consumers would reveal that the group at which the statements were directed was in fact more knowledgeable and sophisticated than the Commissioners had originally anticipated. In any event, we think it can only help, and certainly it will not hurt, to have the testimony before the reviewing Commissioners as well as their own reading of the advertisements.

As authority for the proposition that they could properly ignore the record and make a de novo determination of the capacity of the statement to mislead, the Commissioners state only that "[t]he Commission's authority to predicate a finding of deception on its own examination and study is too well settled to require further comment." (Opinion of

the Commission at 4.) The Commission's counsel reiterated this position on appeal, stating in the brief that:

> The Commission, as stated in its opinion * * *, *evaluated Cinderella's advertising entirely on the basis of its own study of the material. It found no need to resolve the conflicting expert and consumer testimony in the record* bearing upon the meaning of the advertisements.

(Brief for the Respondents at 14; emphasis added.) The brief further states that "[t]he law is too well settled to admit of any doubt that the meaning of advertisements and their tendency or capacity to deceive are questions of fact to be determined by the Commission, whose determination should be upheld unless clearly wrong." *(Id.)*

On its face this statement is true—it is for the Federal Trade Commission to resolve such questions of fact. However, a distinction must be drawn between the "Commission," meaning the entire Federal Trade Commission, including the Commissioners, hearing examiners, staff, etc., and the "Commissioners," who are of course the five Federal Trade Commissioners. It is customary in common parlance, and occasionally even in court opinions, to use the word "Commission" to mean both the broader term and the more restricted group at the top, which would be more accurately termed the "Commissioners." Thus the cases cited by the Commission in the statement that the "law is too well settled to admit of any doubt" are clearly inapposite, for their holdings relate to the entire "Commission," not to the five "Commissioners" sitting as a reviewing body. In the

---

It is not the Commission's "pronouncement" that is important to us; rather, it is what the Commission in fact did. At the one point at which the Commission referred to the record in this regard in their opinion, it was to agree with the hearing examiner's dismissal of one of the charges by stating that "[a] careful review of the record indicates that the evidence and testimony contained

therein is insufficient to support this charge." Opinion of the Commission at 26. These two references are scant evidence that petitioner's attack on procedural grounds is "plainly without merit," especially in view of the repeated statements of the Commission that it was making a de novo evaluation of the advertisements without reference to the evidence.

leading case in this jurisdiction we stated:

> The Commission here has determined that the use of the term "manufacturer's list price" represents to the public that that was the price at which the product was usually and customarily sold by other stores in the area. This determination was within its power, unless it was "arbitrary or clearly wrong." *We cannot say that it was, particularly in view of the consumers' testimony adduced at the hearing.*

Giant Food Inc. v. FTC, 116 U.S.App.D.C. 227, 231–232, 322 F.2d 977, 981–982 (1963), cert. dismissed, 376 U.S. 967, 84 S.Ct. 1121, 12 L.Ed.2d 82 (1964) (emphasis added). From this and other statements of the court in the *Giant Food* case it is quite clear that the use of the words "the Commission" related to the Federal Trade Commission, not to the Federal Trade Commissioners sitting in review of an initial decision. It is therefore not appropriate to say that the court in that case upheld the power of the five Commissioners to review the challenged advertisements de novo, making an independent judgment concerning their capacity to deceive and ignoring the evidence adduced at a lengthy hearing.[5] Counsel for the Commission have therefore seriously misread the cases which they have cited. We are unable to find any authority for their proposition—that

a sixteen-day hearing may be completely ignored if the Commissioners are dissatisfied with the result reached by their hearing examiner. In fact, language in an opinion which the Commission cites cuts decidedly the other way:

> This finding [that advertising tended to deceive] was amply supported by *evidence adduced in the proceedings before the Commission * * *.* The applicable section of the Act provides * * * that upon a review of this kind "[t]he findings of the Commission as to the facts, *if supported by evidence,* shall be conclusive."

Stauffer Laboratories, Inc. v. FTC, 343 F.2d 75, 79 (9th Cir. 1965) (emphasis added).

There is a reason for the procedures set forth in the rules and regulations promulgated under the Federal Trade Commission Act. The procedures which have been established are designed to provide for proceedings in which both the Commission and the responding party have a fair and equal opportunity to present exhibits and witnesses designed to establish the legitimacy of their argument. The regulations are drawn so as to require reliance on that evidence by the hearing examiner.[6] We think it as preposterous for the Commission to claim a right to ignore that evidence and, with more daring than prudence, to decide a case de novo as it would be for this

---

5. A review of the other cases cited by the Commission reveals that in each the court in question referred to the Commission and its integral parts as an entire body in upholding the proposition that the meaning of advertisements and their capacity or tendency to deceive are questions of fact for the Commission to decide unless clearly erroneous; in each there was a review of the evidence in the record. *See* Stauffer Laboratories, Inc. v. FTC, 343 F.2d 75, 79 (9th Cir. 1965); Bakers Franchise Corp. v. FTC, 302 F.2d 258, 261 (3d Cir. 1962); Exposition Press, Inc. v. FTC, 295 F.2d 869, 872 (2d Cir. 1961), cert. denied, 370 U.S. 917, 82 S.Ct. 1554, 8 L.Ed.2d 497 (1962); E. F. Drew & Co. v. FTC, 235 F.2d 735, 741 (2d Cir. 1956), cert. denied, 352 U.S. 969, 77 S.Ct. 360, 1 L.Ed.

2d 323 (1957); Rhodes Pharmacal Co. v. FTC, 208 F.2d 382, 387 (7th Cir. 1953), rev'd in part on other grounds, 348 U.S. 940, 75 S.Ct. 361, 99 L.Ed. 736 (1955); *cf.* FTC v. Colgate-Palmolive Co., 380 U.S. 374, 385–386, 85 S.Ct. 1035, 13 L.Ed.2d 904 (1965); Carter Products, Inc. v. FTC, 323 F.2d 523, 528 (5th Cir. 1963).

6. 16 C.F.R. § 3.51(b) (1969) (emphasis added):

> The initial decision shall include a statement of (1) findings * * * and (2) an appropriate rule or order. *The initial decision shall be based upon a consideration of the whole record and supported by reliable, probative, and substantial evidence.*

court to claim a right to ignore the findings of fact and conclusions of law of a district court in a proceeding here, substituting the judgment of this court on a cold record for that of the finder of the fact below.

█ Counsel for the Commission referred at oral argument to the Supreme Court's decision in FCC v. Allentown Broadcasting Corp., 349 U.S. 358, 75 S.Ct. 855, 99 L.Ed. 1147 (1955), in an effort to convince the court that the Commission could make an independent review of the advertisements without regard to the evidence adduced at the hearing. In that case the Court said:

The Court of Appeals' conclusion of error as to evasiveness relies largely on its understanding that the Examiner's findings based on demeanor of a witness are not to be overruled by a Board without a "very substantial preponderance in the testimony as recorded" * * *. We think this attitude goes too far. It seems to adopt for examiners of administrative agencies the 'clearly erroneous' rule of the Fed. Rules Civ.Proc., 52(a), applicable to courts.

349 U.S. at 364, 75 S.Ct. at 859. Of course, we agree with that statement; we do not mean by our previous statement that the same rule applies to both courts and administrative agencies. The Court went on to cite the *Universal Camera* opinion for the proposition that "[t]he responsibility for decision * * * placed on the Board is wholly inconsistent with the notion that it has power to reverse an examiner's findings only when they are 'clearly erroneous.'" Universal Camera Corp. v. NLRB, 340 U.S. 474, 492, 71 S.Ct. 456, 467, 95 L.Ed. 456 (1951). The determination we make here is not contrary to these statements by the Supreme Court; we do not say that the Commission must find an examiner's findings of fact and conclusions of law "clearly erroneous" before overturning an initial decision, but we do say that it must consider that decision and the evidence in

the record upon which it is based, rather than dismissing the proceedings at the hearing out of hand. To hold otherwise would put us in an impossible situation: the substantial evidence test as explained in *Universal Camera* requires us to review all of the record in determining whether the agency's decision is supported by substantial evidence, yet the Commission contends that it has the power to make an independent determination without reference to the evidence. We hardly think it permissible for the Commission to draw such independent conclusions, while ignoring the record and consequently converting the entire hearing proceeding into a meaningless exercise, leaving it for the court to review the record to find whether there is evidence to support those conclusions.

The procedures for decision on appeal have been established for the Federal Trade Commission as follows:

Upon appeal from or review of an initial decision, the Commission *will consider* such parts of the record as are cited or as may be necessary to resolve the issues presented and, *in addition*, will, to the extent necessary or desirable, exercise all the power which it could have exercised *if* it had made the initial decision.

16 C.F.R. § 3.54(a) (1969) (emphasis added). Surely this language makes it clear that the five Commissioners, in reviewing an initial decision, are not to speak as *verbum regis*, but must consider the evidence adduced at the hearing. The regulation makes it clear that the Commissioners *will* consider the record, and that they may *additionally* exercise the powers they *could* have exercised had they made the initial decision. We do not hold that the Commissioners could not have reviewed the advertisements independently if they had been responsible for the decision from the outset; but when a proceeding which involves sixteen days, 1,810 pages of testimony, fifty-two witnesses, and 247 exhibits, has been established, the Commissioners are not free to boil over in aggression and completely dismiss those

proceedings either because they are dissatisfied with the outcome, or for any other reason. Such procedure is rooted in nothing and places the Commission in the position of being both the instrument and the musician at the same time. The result, legally, is a ragged and confusing mosaic defying the very archetype of due process, abandoning the merit in hearings of the power of persuasion for the persuasion of power and thereby producing a self-justifying system that makes fairness not really the controlling factor in practice that it seems in metaphor.

■■ The regulations establish the procedure the Commission is to follow:

> In rendering its decision [on appeal or review], the Commission *will adopt, modify, or set aside the findings, conclusions, and rule or order contained in the initial decision, and will include in the decision a statement of the reasons or basis for its action.* * * *

16 C.F.R. § 3.54(b) (1969) (emphasis added). This gives the reviewing Commissioners great latitude to disagree with their hearing examiner;[7] it does not, however, give them the option of completely ignoring the testimony of many witnesses and the findings of the examiner on premises which are legally evanescent. If they choose to modify or set aside his conclusions they must state that they are doing so and they must give reasons for so doing. To hold otherwise is to ignore the objectives of adversary proceedings before the Commission. Only if such rules are carefully adhered to can a reviewing court properly analyze the action taken by the Commission; only then can the wheat of meaningful agency action be separated from the chaff of arbitrary and capricious conduct. The Commissioners may not turn away in haughty administrative aloofness from the entire body of law governing their procedures.[8]

## II. DISQUALIFICATION OF CHAIRMAN DIXON

An additional ground which requires remand of these proceedings—and which would have required reversal even in the absence of the above-described procedural irregularities—is participation in the proceedings by the then Chairman of the Federal Trade Commission, Paul Rand Dixon.

Notice that the hearing examiner's dismissal of all charges would be appealed was filed by the Commission staff on February 1, 1968 (Brief for Petitioners at 18). On March 12, 1968, this court's decision was handed down in a prior appeal arising from this same complaint, in which we upheld the Commission's issuance of press releases which called attention to the pending proceedings.[9] Then, on March 15, 1968, while the appeal from the examiner's decision was pending before him, Chairman Dixon made a speech before the Government Relations Workshop of the National Newspaper Association in which he stated:

> What kind of vigor can a reputable newspaper exhibit? The quick answer, of course, pertains to its editorial policy, its willingness to present the news without bias. However, that is only half the coin. How about ethics on the business side of running a paper? What standards are maintained on advertising acceptance? What would be the attitude toward accepting good money for advertising by a merchant who conducts a "going out of business"

7. *See* Sign & Pictorial Union Local 1175 v. NLRB, (D.C.Cir. Sept. 23, 1969) 419 F.2d 726, 733–734.

8. Our remand of this proceeding of course is not meant to reflect any intimation that this court has passed on the merits of the case; such a determination will not be required until such time as the Commission has concluded on the basis of the complete record whether or not Cinderella acted illegally in making the challenged statements in the form of advertisements. Our concern is not that Cinderella be absolved but rather that it be provided due process of law in the manner in which its guilt or innocence is ascertained.

9. FTC v. Cinderella Career & Finishing Schools, Inc., 131 U.S.App.D.C. 331, 404 F.2d 1308 (1968).

sale every five months? *What about carrying ads that offer college educations in five weeks,* fortunes by raising mushrooms in the basement, getting rid of pimples with a magic lotion, *or becoming an airline's hostess by attending a charm school?* Or, to raise the target a bit, how many newspapers would hesitate to accept an ad promising an unqualified guarantee for a product when the guarantee is subject to many limitations? Without belaboring the point, I'm sure you're aware that advertising acceptance standards could stand more tightening by many newspapers. *Granted that newspapers are not in the advertising policing business, their advertising managers are savvy enough to smell deception when the odor is strong enough.* And it is in the public interest, as well as their own, that their sensory organs become more discriminating. The Federal Trade Commission, even where it has jurisdiction, could not protect the public as quickly.

(App. 134; emphasis added.) It requires no superior olfactory powers to recognize that the danger of unfairness through prejudgment is not diminished by a cloak of self-righteousness. We have no concern for or interest in the public statements of government officers, but we are charged with the responsibility of making certain that the image of the administrative process is not transformed from a Rubens to a Modigliani.

█ We indicated in our earlier opinion in this case that "there is in fact and law authority in the Commission, acting in the public interest, to alert the public to *suspected violations* of the law by *factual press releases* whenever the Commission shall have reason to believe that a respondent is engaged in activities made unlawful by the Act * * *." FTC v. Cinderella Career & Finishing

Schools, Inc., 131 U.S.App.D.C. 331, 337, 404 F.2d 1308, 1314 (1968) (emphasis added). This does not give individual Commissioners license to prejudge cases or to make speeches which give the appearance that the case has been prejudged.[10] Conduct such as this may have the effect of entrenching a Commissioner in a position which he has publicly stated, making it difficult, if not impossible, for him to reach a different conclusion in the event he deems it necessary to do so after consideration of the record. There is a marked difference between the issuance of a press release which states that the Commission has filed a complaint because it has "reason to believe" that there have been violations, and statements by a Commissioner after an appeal has been filed which give the appearance that he has already prejudged the case and that the ultimate determination of the merits will move in predestined grooves. While these two situations—Commission press releases and a Commissioner's pre-decision public statements—are similar in appearance, they are obviously of a different order of merit.

As we noted in our earlier opinion, Congress has specifically vested the administrative agencies both with the "power to act in an accusatory capacity" and with the "responsibility of ultimately determining the merits of the charges so presented." 131 U.S.App.D.C. at 338, 404 F.2d at 1315.

Chairman Dixon, sensitive to theory but insensitive to reality, made the following statement in declining to recuse himself from this case after petitioners requested that he withdraw:

As * * * I have stated * * * this principle "is not a rigid command of the law, compelling disqualification for trifling causes, but a consideration addressed to the discretion and sound judgment of the administrator him-

---

10. In its brief the respondent has attempted to demonstrate that Chairman Dixon's speech made reference not to the currently pending case, but rather to two cases which had been decided by the Commission in 1964. In light of the timing of the speech in relation to the proceedings herein, we think the reasonable inference a disinterested observer would give these remarks would connect them inextricably with this case.

self in determining whether, irrespective of the law's requirements, he should disqualify himself."

(App. 143.) To this tenet of self-appraisal we apply Lord Macaulay's evaluation more than 100 years ago of our American government: "It has one drawback—it is all sail and no anchor." We find it hard to believe that former Chairman Dixon is so indifferent to the dictates of the Courts of Appeals that he has chosen once again to put his personal determination of what the law requires ahead of what the courts have time and again told him the law requires. If this is a question of "discretion and judgment," Commissioner Dixon has exercised questionable discretion and very poor judgment indeed, in directing his shafts and squibs at a case awaiting his official action. We can use his own words in telling Commissioner Dixon that he has acted "irrespective of the law's requirements"; we will spell out for him once again, avoiding tired cliche and weary generalization, in no uncertain terms, exactly what those requirements are, in the fervent hope that this will be the last time we have to travel this wearisome road.

■ The test for disquaification has been succinctly stated as being whether "a disinterested observer may conclude that [the agency] has in some measure adjudged the facts as well as the law of a particular case in advance of hearing it." Gilligan, Will & Co. v. SEC, 267 F.2d 461, 469 (2d Cir.), cert. denied, 361 U.S. 896, 80 S.Ct. 200, 4 L.Ed.2d 152 (1959).

That test was cited with approval by this court in Texaco, Inc. v. FTC, 118 U.S.App.D.C. 366, 336 F.2d 754 (1964), vacated and remanded on other grounds, 381 U.S. 739, 85 S.Ct. 1798, 14 L.Ed.2d 714 (1965). In that case Chairman Dixon made a speech before the National Congress of Petroleum Retailers, Inc. while a case against Texaco was pending before the examiner on remand. After restating the test for disqualification, this court said:

■ [A] disinterested reader of Chairman Dixon's speech could hardly fail to conclude that he had in some measure decided in advance that Texaco had violated the Act.

118 U.S.App.D.C. at 372, 336 F.2d at 760. We further stated that such an administrative hearing "must be attended, not only with every element of fairness but with the very appearance of complete fairness," citing Amos Treat & Co. v. SEC, 113 U.S.App.D.C. 100, 107, 306 F.2d 260, 267 (1962). We therefore concluded that Chairman Dixon's participation in the *Texaco* case amounted to a denial of due process.

After our decision in *Texaco* the United States Court of Appeals for the Sixth Circuit was required to reverse a decision of the FTC because Chairman Dixon refused to recuse himself from the case *even though he had served as Chief Counsel and Staff Director* to the Senate Subcommittee which made the initial investigation into the production and sale of the "wonder drug" tetracycline. American Cyanamid Co. v. FTC, 363 F.2d 757 (1966). Incredible though it may seem, the court was compelled to note in that case that:

[T]he Commission is a fact-finding body. As Chairman, Mr. Dixon sat with the other members as triers of the facts and *joined in making the factual determination* upon which the order of the Commission is based. *As counsel for the Senate Subcommittee, he had investigated and developed many of these same facts.*

363 F.2d at 767 (emphasis added). It is appalling to witness such insensitivity to the requirements of due process; it is even more remarkable to find ourselves once again confronted with a situation in which Mr. Dixon, pouncing on the most convenient victim, has determined either to distort the holdings in the cited cases beyond all reasonable interpretation or to ignore them altogether. We are constrained to this harshness of language because of Mr. Dixon's flagrant disregard of prior decisions.

■ The rationale for remanding the case despite the fact that former Chairman Dixon's vote was not necessary for a majority is well established:

> Litigants are entitled to an impartial tribunal whether it consists of one man or twenty and there is no way which we know of whereby the influence of one upon the others can be quantitatively measured.

Berkshire Employees Ass'n of Berkshire Knitting Mills v. NLRB, 121 F.2d 235, 239 (3d Cir. 1941). This rationale was cited with approval in the *American Cyanamid* opinion; we adopt the position of our sister circuits on this point.

### III. CONCLUSION

For the reasons set forth above we vacate the order of the Commission and remand with instructions that the Commissioners consider the record and evidence in reviewing the initial decision, without the participation of Commissioner Dixon.

*Vacated and remanded.*