[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
On February 14, 1989, following more than a year of hearings, the Board of Police Commissioners of the Borough of Naugatuck (the "Board") removed Dennis E. Clisham ("Clisham"), the Naugatuck Chief of Police, from office and terminated his employment. Clisham has appealed to this court, raising both procedural and substantive issues concerning his removal. For the reasons stated below, the appeal is dismissed.
I. STATEMENT OF FACTS
Clisham, previously a lieutenant in the Naugatuck police department, was appointed Chief of Police by the Board on July 26, 1984. On December 9, 1987, the Board gave Clisham written notice of eleven charges against him. The original charges concerned several different incidents, but a number of charges (written charges 7-11) were eventually dismissed, and the Board found two more charges (written charges 4-5) to be not proven. In addition, one charge (written charge 6) which originally contained a number of allegations was modified by the Board at the time of its vote to an allegation concerning a single incident. The Board ultimately found that charges concerning two separate incidents had been proven. These incidents can be conveniently described as the Lydem incident and the Gene's Cafe incident. They can be summaried as follows: CT Page 7283
The Lydem Incident (Written Charge 6)
The Board heard evidence which, if credited, might reasonably establish the following facts. On July 10, 1978, at a time when Clisham was still a lieutenant, Leonard and Patricia Lydem, a married couple, lived in Naugatuck in the same general neighborhood as Clisham's residence. At about 8:30 P.M., the Lydems were sitting on their front porch when Mrs. Lydem noticed Clisham apparently urinating by a car near their house. Mr. Lydem walked toward him and asked him what he was doing. Clisham replied, "None of your fucking business." Clisham commenced to call Mr. Lydem a variety of obscene names and was loud and abusive. He asked if Mr. Lydem would like to know who he was and flashed what appeared to be a badge. Mrs. Lydem called the police. Clisham pulled Mr. Lydem's beard, slapped his face, and called him "yellow belly" and "a fucking punk." He then punched Lydem in the face, knocking his glasses off. Mr. Lydem ran into his house, and Clisham followed him, saying that he would break the door down. When Lydem reached the foyer, Clisham jumped on him, put a gun to his head, and said, "I will blow your fucking brains out." Clisham then handcuffed Mr. Lydem behind his back, kicked him, and banged his head against the stairs. When Mrs. Lydem attempted to come to her husband's aid, Clisham grabbed her, threw her against the staircase, and kicked her. He then stomped on Mr. Lydem's bare feet and attempted to pull him out of the door by the handcuffs. (5/10/88 T. 4-16, 53-66.)
When the police arrived, Clisham yelled that he was arresting Mr. Lydem and that they were to arrest Mrs. Lydem. Clisham repeatedly called Mrs. Lydem a fucking whore. The Lydems were taken to the police station, where they were eventually released on bond. The criminal charges against them were subsequently dismissed. Mr. Lydem suffered bruises, and Mrs. Lydem suffered a broken foot. (5/10/88 T. 16-26, 68-73.)
On September 4, 1979, the Lydems filed an action for damages against Clisham and the Borough of Naugatuck in the United States District Court for the District of Connecticut pursuant to42 U.S.C. § 1983 and 1988. Lydem v. Clisham, Civ. No. 79-317. On January 25, 1982, the parties stipulated that the action should be dismissed with prejudice. (Court's Ex. 1.)
On March 30, 1984, a taxpayer of the Town of Naugatuck named Michael Rizzutti filed a complaint against the then-members of the Board in this Court. Rizzutti v. Rado, No. 068681. The complaint, which was served on the members of the Board on March 26, 1984, sought an injunction prohibiting the Board from appointing Clisham as Chief of Police. It alleged that Clisham had committed a series of malfeasances, the Lydem incident among them. The defendants filed an appearance on April 9, 1984. The CT Page 7284 case was eventually dismissed on November 25, 1986.
As mentioned above, the Board appointed Clisham Chief of Police on July 26, 1984. The minutes of the Board's meeting do not reflect any discussion of the Lydem (or any other) incident. (Plaintiff's Ex. G.) On August 16, 1984, after Clisham had assumed office, the Board voted to set aside funds to pay for his attorney in the Rizzutti action. (Plaintiff's Ex. H.)
The Gene's Cafe Incident (written charges 1-3)
The Board heard evidence which, if credited, might reasonably establish the following facts. On the evening of October 6, 1987, Norma Malec was in Gene's Cafe, a Naugatuck bar, helping her son, Daniel Regan, the bartender. Clisham was there with two of his friends — Tony Dudek and Al Boucher. The manager, Craig Johnson, was also there. At about 10:00 p. m. a man named Richard Schaefer came into the bar. Clisham and his friends were talking about the Avcollie case. See State v. Avcollie, 188 Conn. 626, 453 A.2d 418
(1982), cert. denied, 461 U.S. 928 (1983). Schaefer approached Clisham and asked, "Who the heck do you think you are, Mayor Buckmiller?" Clisham, evidently no fan of the Mayor, called Schaefer an asshole. Schaefer returned to his seat, but Clisham moved toward him, wanting to fight. Clisham said, "You're mine. I want you." Johnson intervened and pushed Clisham back, but Clisham continued to yell and curse at Schaefer. Clisham then said to Boucher, "You owe me." Boucher thereupon punched and kicked Schaefer. Following this, Clisham continued to tell Schaefer, "You are still mine" and "I will get you." Dudek told Malec to call the police, but when she got up to do so, Clisham told her, "If you touch the phone, your ass is dead." Schaefer suffered a black eye and a swollen nose from the attack upon him by Boucher. (1/26/88 T. 23-32, 109-21; 3/29/88 T. 3-13.)
The Board heard testimony concerning these incidents, as well as other incidents not ultimately found proven, in a series of hearings lasting over a year. Clisham was represented by able counsel, confronted and cross-examined the witnesses against him, and presented witnesses in support of his own, substantially different, version of the events in question. (Clisham essentially claimed that the Lydems and Schaefer had attacked him rather than vice-versa; obviously, this version was not believed.) The forms of due process were fully observed. Clisham maintains, however, that the forms were, in his case, hollow because a number of Board members were biased against him. To fully understand this claim, some background is necessary.
When Clisham was appointed Chief of Police in 1984, the member of the Board seconding his nomination was the then-Mayor of Naugatuck, William Rado. (Plaintiff's Exhibit G.) In 1985, Rado CT Page 7285 was defeated by Terry Buckmiller. Carl Miele, the Democratic Town Chairman of Naugatuck and a political advisor of Buckmiller's, testified that Buckmiller had publicly pledged during the campaign to remove Clisham from office. (8/30/88 T. 24.) Whatever the truth of this allegation (the Board made no findings upon which the Court can rely), it is reasonably clear that Buckmiller appointed all five members of the Board that heard Clisham's removal case, since no members of the 1984 Board that had appointed Clisham were in office when the removal hearings began in 1987. Clisham maintains that two of those members — Edward Mason and Rocco DeCarlo, Sr. — were biased against him. (A claim involving a third Board member, Robert Sharon, was withdrawn at oral argument.) The claims that he has briefed against these members (claims raised below but not briefed on appeal being deemed abandoned, see, e.g., Douglas v. Warden, 218 Conn. 778, 782
n. 4 (1991)) are as follows.
Edward Mason
Clisham presented evidence which would, if credited, establish that Mason was one of a small group of close advisors of Buckmiller during and after the 1985 campaign. Mason expressed support for the proposition that Clisham should not be chief of police. As discussed below, 1953 Conn. Spec. Acts 321, the act creating the Board, provides that the removal of any Naugatuck police officer, including the chief of police, requires an affirmative vote of all five members of the Board. Id. Sec. 4. Mason was assigned by Buckmiller to persuade the Board to adopt regulations permitting dismissal by a majority. The Board eventually decided that it lacked the authority to do so. (8/30/88 T. 24-29.)
The other indicium of bias that Clisham attributes to Mason involves a remark that Mason made concerning a Connecticut Magazine article on the mayoral change in Naugatuck. Weir, The Tale of Two Mayors, August, 1988 Conn. Maganne 152. The article can reasonably be described as favorable to Buckmiller and contains some unfavorable statements by Buckmiller regarding Clisham. Terence Corcoran, a reporter for The Waterbury Republican and American, testified that he spoke with Mason concerning the article and Mason said, "Being a supporter of Buckmiller, I thought it was great. I thought it was devasting for Clisham, Rado and Company. Whoever wrote it, he is a friend of mine. Of course, if you are not a Rado supporter, you are not going to like it." (9/20/88 T. 7.) Although Corcoran did not testify when this conversation had occurred, his article appeared on July 26, 1988. The record does not reflect whether or not the Board found his testimony credible, but the Board conceded at oral argument that the statement had been made. CT Page 7286
Rocco DeCarlo, Sr.
Clisham asserts on appeal that there are two indicia of bias with respect to DeCarlo. Carl Miele testified that on three or four occasions in 1983 and 1984 DeCarlo told him that Clisham shouldn't be on the police force, that he shouldn't be police chief and that "he should be out of there." (8/30/88 T. 44-45.) Clisham also marked for identification a November 24, 1985, written statement of his son, Dennis E. Clisham, Jr., that on July 5, 1985, in a Naugatuck restaurant, he overheard DiCarlo state "the new chief of police is no good and that new mayor will get rid of him." This statement was offered on December 5, 1988. Clisham did not present his son as a witness.
Clisham presented his claims of bias before the Board in the following manner. On December 15, 1987, he made an oral motion that Mayor Buckmiller recuse himself, which Buckmiller immediately granted. (12/15/87 T. 4.) On January 26, 1988, Clisham made a second oral motion that DeCarlo recuse himself, not for any of the reasons now raised on appeal, but because DeCarlo was a defendant in a civil action brought by Clisham in the United States District Court. In response to this request, DeCarlo offered to step aside if Clisham agreed to accept any decision eventually made by the remaining four members of The Board. Clisham did not agree to this procedure, and DeCarlo consequently declined to recuse himself. (1/26/88 T. 12-17).
Subsequently, on August 30, 1988, after approximately seven months of hearings and after the Board's entire case-in-chief had been presented, Clisham filed a written Motion To Disqualify Mason and DeCarlo alleging, in much abbreviated form, the allegations of bias now raised on appeal. After hearing the witnesses presented by Clisham on this matter — but after refusing to allow individual members of the Board to be examined — Mason and DeCarlo declined to recuse themselves.
The final claim raised by Clisham involves the structure of the votes taken by the Board on February 14, 1989. Although, as discussed above, the Board found two incidents — the Lydem incident and the Gene's Cafe incident — to be proven, the Board actually voted on six different charges. Charges 1-3 concerned the Gene's Cafe incident. Charge 1, alleging that Clisham had threatened Norma Malee's life, was found to be proven by a vote of four to one, with Mason dissenting. (2/14/89 T. 40-41.) Charge 2, alleging that Clisham had threatened Richard Schaefer's life, was found to be proven by a vote of three to two, with Mason and Sharon dissenting. (2/14/89 T. 52-53.) Charge 3, alleging that Clisham had solicited a physical assault on Schaefer, was found to be proven by a vote of three to two, with Mason and Board member Maruta Jancis dissenting. (2/14/89 T. 63.) Charges 4 and 5, CT Page 7287 involving an alleged incident in another bar, were found to be not proven by unanimous votes. (2/14/89 T. 74-75.) Charge 6, involving the Lydem incident, was found to be proven by a unanimous vote. (2/14/89 T. 97.) Following this vote, a discussion as to the appropriate penalty ensued. The Chairman, Jack Prior, moved that "Clisham be terminated from The Naugatuck Police Department effective immediately for the violations that we have voted on tonight." The motion was passed by a unanimous vote. (2/14/89 T. 105-06.)
The Board served Clisham with a written notice of its decision on February 21, 1989. Clisham appealed to this court by a complaint served on March 16, 1989. A hearing was held on June 27, 1991. Clisham concisely states at the beginning of his brief that, "The principal contentions on this appeal are that the removal decision (1) was made by a biased panel; (2) was based on improper grounds; and (3) was obtained by an improper vote." (Plaintiff's brief at 1.) The court reviews these respective contentions in the order in which they have been presented.
II. DISCUSSION
A. THE CLAIM OF BIAS
All but one of Clisham's bias claims — the claim involving Mason's July 1988 statement to Terence Corcoran — must be dealt with rather summarily. They were raised in an unacceptably belated fashion in the tribunal below. It is well established that "[a] claim of disqualifying bias or partiality on the part of a member of the judiciary or an administrative agency must be asserted promptly after knowledge of the alleged disqualification." Duffield v. Charleston Area Medical Center, Inc., 503 F.2d 512, 515 (4th Cir. 1974). The hearings in this case began in December 1987. Clisham first raised the claims of bias that he is now pursuing on appeal in his written motion of August 30, 1988, after the Board had spent seven months hearing the entire case-in-chief. The claims involving Mason (other than the statement to Corcoran) concern conduct allegedly occurring at about the time of the May 1985 election. The claims involving DeCarlo concern statements allegedly made between 1983 and July 5, 1985. Clisham does not claim that he learned of these alleged facts belatedly. Indeed, he must have known of the alleged 1985 statement by DeCarlo in a reasonably prompt fashion since the person who allegedly heard that statement was his son. Similarly, it could hardly have been unknown to Clisham that Mason was involved in the May 1985 mayoral campaign. Yet Clisham waited until months of hearings had been held before raising his claims of bias. This procedure cannot be countenanced.
In this case, as in Henderson v. Department of Motor CT Page 7288 Vehicles, 202 Conn. 453, 521 A.2d 1040 (1987),
 Although the plaintiff did not actually know the outcome at the hearing when he finally made his motion. . .he may have sensed from the testimony of the witnesses. . .that the adjudicator's decision on the merits would probably be adverse. The failure to raise a claim of disqualification with reasonable promptness after learning the ground for such a claim ordinarily constitutes a waiver thereof.
Id. at 462. The record here does not affirmatively indicate when Clisham actually learned the grounds for his bias claims. With respect to DeCarlo's alleged statements, Miele testified that he had told Clisham's wife of the statements to him "two, three months" before his August 30, 1988 testimony. (8/30/88 T. 46) Of course DeCarlo's alleged July 5, 1985 statement was, Clisham claims, overheard on that very day by his son. With respect to Mason's involvement in the May, 1985 campaign, it would be, as noted above, quite surprising if Clisham had not known of the facts he alleges at the time of the campaign since Clisham was, or so he claims, a major issue in that campaign. In any event, it is established law that "`[A]fter a trial has commenced, no attempt to recuse a judge will be listened to unless it is shown affirmatively that the party was not aware of the objection, and was in no fault in not knowing it.'" Duffield v. Charleston Area Medical Center, Inc., supra, 503 F.2d at 516 (quoting Moses v. Julian, 45 N.H. 52, 54 (1863)). No such showing appears here. Consequently, Clisham must be held to have waived his belated claims.
The claim involving Mason's statement to Corcoran must be addressed on its merits. Mason acted in a quasi-judicial capacity as a member of the board, and, as the Supreme Court of the United States has repeatedly recognized, "due process demands impartiality on the part of those who function in judicial or quasi-judicial capacities." Schweiker v. McClure, 456 U.S. 188,195 (1982). On the other hand, it is well established that,
 [D]ue process does not require that members of administrative agencies adhere in all respects to the exalted standards of impartiality applicable to the judiciary. Schweiker v. McClure, 456 U.S. 188, 197 n. 11. . .(1982). "The mere appearance of bias that might disqualify a judge will not disqualify CT Page 7289 an arbitrator." Florasynth, Inc. v. Pickholz, 750 F.2d 171, 173-74 (2d Cir. 1984); see Petrowski v. Norwich Free Academy, [199 Conn. 231], 237 [, 506 A.2d 139, appeal dismissed. 479 U.S. 802
(1986)] A presumption of impartiality attends administrative determinations, and the burden of establishing a disqualifying interest on the part of an adjudicator rests upon the one seeking disqualification. Schweiker v. McClure, supra, 195-96; Withrow v. Larkin, 421 U.S. 35, 47. . .(1975). To overcome the presumption, the plaintiff in this case must demonstrate actual bias, rather than mere potential bias, of the board members challenged, unless the circumstances indicate a probability of such bias "too high to be constitutionally tolerable." Withrow v. Larkin, supra.
Rado v. Board of Education, 216 Conn. 541, 556, 583 A.2d 102
(1990).
The concept of "bias," as Professor Kenneth Culp Davis explains in his well-known treatise, "has a multiplicity of meanings." K. Davis, Administrative Law Treatise 371 (2d ed. 1980). Two types of bias must be distinguished here. One is "[a] prejudgment or point of view about a question of law or policy"; the other is "[a] personal bias or personal prejudice, that is, an attitude toward a person, as distinguished from an attitude about an issue." Id. Mason's statement to Corcoran indicates a personal distaste for Clisham rather than a prejudgment about any of the issues before the Board (none of which are even mentioned in either the Connecticut Maganne article or Mason's statement). Courts considering claims of prejudgment of issues have used what is sometimes referred to as the "Cinderella test," enunciated in Cinderella Career and Finishing Schools, Inc. v. FTC, 425 F.2d 583
(D.C. Cir. 1970). The question to be addressed under this test is "Whether `a disinterested observer may conclude that [the agency] has in some measure adjudged the facts as well as the law of a particular case in advance of hearing it.'" Id. at 591 (quoting Gilligan, Will Co. v. SEC, 267 F.2d 461, 469 (2d Cir.), cert. denied, 361 U.S. 896 (1959)). The crucial question under this test is whether or not there has been a prejudgment of the facts of the "particular case." A decisionmaker is not disqualified "simply because he has taken a position, even in public, on a policy issue related to the dispute in the absence of a showing that he is not `capable of judging a particular controversy fairly CT Page 7290 on the basis of its own circumstances.'" Hortonville Joint School District No. 1 v. Hortonville Education Assn., 426 U.S. 482, 493
(1976) (quoting United States v. Morgan, 313 U.S. 409, 421 (1941). See FTC v. Cement Institute, 333 U.S. 683, 703 (1948).
Mason's statement, as noted, said nothing about the particular case before the Board. The reason that it is troubling is that it suggests a personal antipathy towards Clisham that is not consistent with the impartiality that due process demands of a quasi-judicial official. A personally biased decisionmaker is plainly "constitutionally unacceptable." Withrow v. Larkin,421 U.S. 35, 47 (1975), but the standard for determining whether personal bias has reached a level that requires an administrative decision to be set aside "is an exacting one, and requires that the [adjudicator's] conduct be so extreme that it deprives the hearing of that fairness and impartiality necessary to that fundamental fairness required by due process," NLRB v. Webb Ford, Inc., 689 F.2d 733, 737 (7th Cir. 1982). It must appear, as the Fifth Circuit succinctly explained long ago, "that the proceedings were characterized by fell expedition or determined purpose to reach a predetermined end." Continental Box Co. v. NLRB, 113 F.2d 93,96 (5th Cir. 1940). If it appears from the record that an administrative hearing was essentially a kangaroo court, the result of that hearing must be set aside. Examples of this include Miller v. City of Mission, Kansas, 705 F.2d 368 (10th Cir. 1983), and Staton v. Mayes, 552 F.2d 908 (10th Cir.), cert. denied, 434 U.S. 907 (1977), where the administrative hearings at issue were summary or nonexistent and it was clear from the record that there was a "determined purpose to reach a predetermined end." If, however, "the printed transcript suggests thoughtful and discriminating evaluation of the facts," NLRB v. Pittsburgh S.S. Co., 337 U.S. 656, 660 (1949), disqualifying personal bias will not be found. See K. Davis, Administrative Law Treatise, supra, at 390-92.
Reviewing the record with this standard in mind, the Court is unable to conclude that the record establishes a personal bias sufficiently great to require the result of the hearing to be set aside. The hearing was certainly not "characterized by fell expedition." It lasted over a year, and Clisham's procedural due process rights were meticulously observed. With respect to Mason, it must be observed that he took an active part in the February 14, 1989, deliberations and found five of the six charges pending against Clisham to be not proven. On each of the three charges involving the Gene's Cafe incident, Mason was in a minority voting for Clisham; on written charge 1, claiming that Clisham had threatened Malec, Mason was the only member voting for an acquittal. This is not the sort of behavior that one expects from a member of a kangaroo court. Clisham claimed in oral argument that Mason's votes in his favor were, in fact, a clever CT Page 7291 ruse to disguise Mason's real agenda of removing Clisham from office. The short answer to this contention is that a scheme this diabolical will not be presumed without evidence. The presumption is just the opposite. Those charged with adjudicatory functions "are assumed to be men of conscience and intellectual discipline, capable of judging a particular controversy fairly on the basis of its own circumstances." United States v. Morgan, supra,313 U.S. at 421. The facts in this record are not sufficient to require that this assumption be set aside.
The court is constrained to add that, for the reasons just discussed, it would not set aside the results of the hearing even if all of the bias claims Clisham now makes against Mason and DeCarlo had been raised in a timely fashion below. DeCarlo, it should be noted, joined Mason and the other Board members in voting for an acquittal on written charges 4 and 5. More importantly, as in NLRB v. Pittsburgh S.S. Co., supra,337 U.S. at 660, "the printed transcript suggests thoughtful and discriminatory evaluation of the facts" by each member of the Board. Under these circumstances, there is no legal basis for invalidating the result of the hearing on the ground of bias.
B. THE CLAIM OF AN IMPROPER GROUND
Clisham next argues that the Board's removal decision should be set aside because it was, at least in part, based on the Lydem incident, which was, so he claims, an improper ground for removal. The alleged impropriety stems from the undisputed fact that the Lydem incident occurred six years before Clisham became Chief of Police and from Clisham's disputed contention that the Board knew of the incident — or at least an allegation of the incident — when it made its 1984 appointment.
The initial hurdle which Clisham must overcome is the familiar doctrine of administrative law that "[w]here. . .one of the stated reasons is sufficient to support the action of the commission, then that action should be sustained by the court." City of New Haven v. Freedom of Information Commission, 205 Conn. 767,778, 535 A.2d 1297 (1988). See Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc., 419 U.S. 281, 286-87 (1974). This doctrine would ordinarily be fatal to Clisham, for the Board based its ruling on the Gene's Cafe incident as well as the Lydem incident, and the Gene's Cafe incident, if credited, is sufficient to support the action of the Board. There are, however, compelling reasons to decline to apply the alternative basis doctrine in this case.
Although the Connecticut Supreme Court has never articulated the rationale underlying the alternative basis doctrine since it was first enunciated without explanation in Senior v. Zoning CT Page 7292 Commission, 146 Conn. 531, 534, 153 A.2d 415 (1959), appeal dismissed, 363 U.S. 143 (1960), the doctrine's policy can fairly be traced to the landmark case of SEC v. Chenery Corp., 318 U.S. 80
(1943). Writing for the court, Justice Frankfurter explained that, "The reason for this rule is obvious. It would be wasteful to send a case back to a lower court to reinstate a decision which it had already made but which the appellate court concluded should properly be based on another ground." Id. at 88. Thus articulated, this rule does not sensibly apply "when the reviewing court concludes there is a significant chance that but for the error the agency might have reached a different result." Friendly, Chenery Revisited: Reflections on Reversal and Remand of Administrative Orders, 1969 Duke L.J. 199, 211 (1969). See Salt River Project Agricultural Improvement and Power District v. United States, 762 F.2d 1053, 1060-61 n. 8 (D.C. Cir. 1985). There was, in the instant case, a statutory requirement that the removal vote be unanimous. 1953 Conn. Spec. Acts 321, Sec. 4. The Gene's Cafe incident was found to be proven by a series of nonunanimous votes. The Lydem incident, in contrast, was found to be proven by a unanimous vote. There is, consequently, a significant chance that, but for the Lydem incident, the Board might have reached a different result. It is, therefore, appropriate to consider Clisham's claim on its merits.
The Court must first consider the appropriate statutory standard by which the Board's removal decision must be tested. 1953 Conn. Spec. Acts 321, which created the Board of Police Commissioners for the Town and Borough of Naugatuck, provides that removal may be ordered "for malfeasance or for any neglect or refusal to properly perform [an officer's] duties." Conn. Gen. Stat. Sec. 7-278 (1991), in contrast, provides that, "No active head of any police department of any town, city or borough shall be dismissed unless there is a showing of just cause." It has long been held that, "A special and local statute, providing for a particular case or class of cases, is not affected by a statute general in its terms, broad enough to include cases embraced in the special law, unless the intent to repeal or alter is manifest." State ex rel. Wallen v. Hatch, 82 Conn. 122, 124-25,72 A. 575 (1909). No intent to repeal or alter the 1953 special act is manifest in Conn. Gen. Stat. Sec. 7-278. Consequently, the Court agrees with both parties that the special act preempts the field and is controlling in this case.
"[A] malfeasance is the doing of an act wholly wrongful and unlawful." Coite v. Lynes, 33 Conn. 109, 115 (1865). Clisham's conduct in the Lydem incident, if the testimony before the Board is to be credited, was plainly an act of this description. His physical assaults on the Lydems, his invasion of their home, and his threats made with a drawn firearm were horrifying crimes that cannot remotely be described as anything other than wholly CT Page 7293 wrongful and unlawful. Moreover, even though Clisham was apparently off-duty at the time of the Lyden incident, his display of his badge, his use of his handcuffs, his use of his firearm and, especially, his arrest of Mr. Lyden and his command to his fellow officers to arrest Mrs. Lydem plainly constituted a misuse of his official police position. Thus, even if the term "malfeasance" is defined as requiring a connection with the performance of official duties, see Williams v. City of Dover,130 N.H. 527, 543 A.2d 919, 921 (1988), and authorities cited therein, Clisham's conduct during the Lydem incident can fairly be considered to be the sort of malfeasance that would justify his removal from office.
The difficulty in this case arises from the fact that the Lydem incident occurred prior to Clisham's appointment as Chief of Police. Authorities are divided on the issue of whether this fact precludes removal from a currently held office. See Annotation, Removal of Public Officers for Misconduct During Previous Term, 42 A.L.R.3d 691 (1972). The Connecticut Supreme Court has, however, held that the ability to remove an officer does not depend on the timing of that officer's misconduct. In Bolton v. Tully,114 Conn. 290, 158 A. 805 (1932), the Supreme Court considered the case of an assistant corporation counsel of the City of New Haven who was removed from office in part because of misconduct that had occurred during a previous term in the same office. The court held that "conduct of the plaintiff during a previous term in office, not known to the defendant at the time of his reappointment, could be made the basis of his removal from office." Id. at 296-97. See also Wilber v. Walsh, 147 Conn. 317,321, 160 A.2d 755 (1960). The reason for this rule, as one of the cases cited by Bolton explains, is that, "The object of our statute is to purge the public service of an unfit officer." Attorney General v. Tufts, 239 Mass. 458, 131 N.E. 573, 576 (1921). It would, as the New York Court of Appeals has pointed out, "be an unseemly and unsound distinction with respect to a matter affecting general character and fitness to immunize [an officer] from his prior misconduct as [an officer] of lesser or higher rank." Sarisohn v. Appellate Division, 21 N.Y.2d 36,233 N.E.2d 276, 281, 286 N.Y.S.2d 255 (1967). Although the contention that a public officer may not be removed for acts committed in a prior office is not insubstantial, see State ex rel. Turner v. Earle, 295 So.2d 609, 613 (Fla. 1974), and authorities cited therein, the better view — and, in any event, the controlling view in Connecticut — is that such prior acts may properly be considered in a removal decision.
There is an important qualification to this rule, as Bolton v. Tully explains. A prior act can be made the basis for a removal decision only if it was "not known" to the appointing authority. 114 Conn. at 296. If a prior act has actually and CT Page 7294 fully come to the attention of the appointing authority at the time of appointment, the appointment should, as a matter of fundamental fairness, preclude the future consideration of that act, at least standing alone, as a basis for removal. Under those circumstances, as Clisham points out, common law waiver and estoppel problems might arise as well, given the officer's career reliance on the Board's decision. A waiver, however, "is the intentional relinquishment of a known right," Novella v. Hartford Accident and Indemnity Co., 163 Conn. 552, 561, 316 A.2d 394
(1972), and "[o]ne of the essential elements of an estoppel is that the facts relied on to create it must be known to the party to be estopped at the time of his conduct, or at least the circumstances must be such that knowledge of them is necessarily imputed to him," Fidelity and Casualty Co. v. Palmer, 91 Conn. 410, 419,99 A. 1052 (1917). On the other hand, if the appointing authority either has no knowledge of the prior act or is unaware of some substantial element of it, the statutory right of the Board "to purge the public service of an unfit officer," Attorney General v. Tufts, supra, 131 N.E. at 576, justifies subsequent removal. Removal is appropriate if it is fairly determined after a due process hearing that the officer in question committed a malfeasance that, if known at the time, would have — at least in a rational world where corruption and partiality did not carry the day — resulted in a denial of appointment. See Kentucky Bar Association v. Signer, 533 S.W.2d 534, 537 (Ky. 1976).
Clisham argues that the Board must have known of the Lydem incident when he was appointed in 1984, both because Naugatuck is a small town where a spectacular event like the Lydem incident is likely to be widely known and because of the legal actions brought by the Lydems and Rizutti. This is, indeed, strong circumstantial evidence of knowledge of the accusation which if presented to a court or jury charged with determining the facts as a matter of first instance might well prove persuasive. The Court's function in this case, however, is not to act as a primary factfinder but to rule on the record of an appeal from a decision of an administrative agency. The record here is devoid of any indication that the Board, when it appointed Clisham, had any knowledge of the Lydem incident. In fact, as noted previously, the Lydem incident is not even mentioned in the Board's minutes of the appointive meeting.
In any event, knowledge of an allegation even if it exists, is not equivalent to knowledge of the facts. It is not uncommon for complaints to be lodged and lawsuits to be filed against public officials. Some of these are groundless and some are not. The complaints involving the Lydem incident turned out to be very well founded indeed. But the Board did not have knowledge of the actual facts of that incident until it heard the Lydems testify before them in 1988. If the Lydems had appeared before the Board CT Page 7295 before Clisham was appointed in 1984 or even, for that matter, if the incident had been fully discussed at that time, Clisham would have cause to complain that the Board unjustifiably changed its mind later on. That is not, however, what happened. What happened is that the Board officially heard of the facts of the Lydem incident for the first time after Clisham had been appointed. The facts were horrifying facts, facts which plainly constitute the basis for a finding of malfeasance under the controlling statute. The Board had the right and the obligation "to purge the public service of an unfit officer." Its actions here violated neither the controlling statutes nor the demands of due process.
C. THE CLAIM OF AN IMPROPER VOTE
Clisham finally claims that his removal was obtained by an improper vote. The controlling statute, it will be recalled, provides that "removal shall require an affirmative vote of all five members of the board of police commissioners." 1953 Conn. Spec. Acts 321, Sec. 4. The actual removal vote here was indeed unanimous, as Clisham readily acknowledges. But the removal vote was based on the violations that the Board had found to be proven earlier in the same proceeding, and the votes on the three violations arising from the Gene's Cafe incident (written charges 1, 2 and 3) were nonunanimous. Clisham contends that the structure of the vote violates the unanimity requirement of the 1953 Special Act.
The claim that Clisham is asserting here is statutory in nature (he agreed at oral argument that any constitutional rights he enjoys with respect to this issue are created by the controlling statute and coterminous with it), and it is, consequently necessary to review the statute. The statute states that "removal shall require an affirmative vote of all five members" of the Board. "It is well settled that a statute must be applied as its words direct." City of New Haven v. United Illuminating Co., 168 Conn. 478, 485, 362 A.2d 785 (1975). The statute requires a unanimous vote only for "removal." "Removal," as used in a statute of this sort, plainly refers to a "removal of an officer from his office." Murley v. Raritan Township,117 N.J.L. 357, 188 A. 739, 740 (1937). See Black's Law Dictionary 1295 (6th ed. 1990). The Board correctly points out that "removal" refers to only one sanction of the many that the Board may impose after a violation is found. It is a fair reading of the statute that lesser sanctions, such as reprimands or suspensions, need not be imposed by unanimous votes. It is, similarly, a fair reading of the statute, that "removal" is distinct from the grounds upon which removal is based. "Courts cannot by construction, read into statutes provisions which are not clearly stated." Houston v. Warden, 169 Conn. 247, 251, CT Page 7296363 A.2d 121 (1975). If the legislature had intended the Board's removal decision to be based on unanimously found grounds, it would have said so.
Clisham attempts to extricate himself from the limited rights the controlling statute confers by drawing on a body of law deriving from United States v. Gipson, 553 F.2d 453 (5th Cir. 1977), that limits the circumstances under which a unanimous jury verdict in a criminal case can be accepted where the trial court's charge permits the jurors to disagree on the particular acts that the defendant has committed. Gipson has been rather narrowly construed by the Connecticut Supreme Court, see State v. Jennings,216 Conn. 647, 662-63, 583 A.2d 915 (1990), and recently rejected by the Supreme Court of the United States in Schad v. Arizona,111 S.Ct. 2491, 2498-99 (1991). These considerations aside, Clisham's analogy is unsound in the first place because the Gilson rule, assuming that it has any continuing validity after Schad, is a protection, like the reasonable doubt standard, specifically designed to protect the rights of a defendant in a criminal case. See United States v. Gipson, supra, 553 F.2d at 457. "[D]ifferences in the origin and function of administrative agencies `preclude wholesale transplantation of the rules of procedure, trial and review which have evolved from the history and experience of courts.'" Matthews v. Eldridge, 424 U.S. 319,348 (1976) (quoting FCC v. Pottsville Broadcasting Co., 309 U.S. 134,143 (1940)). While Clisham has liberty and property interests at stake, his constitutional interests and statutory rights simply do not rise to the level of those enjoyed by a criminal defendant. As even he admits, his rights in this regard are defined by the statutory text. The statutory text, fairly read, allows a unanimous removal vote to be based on nonunanimous grounds.
There are undoubtedly limits to the latitude which the statute, literally read, gives to the Board. If the Board were to find a single violation by a three to two vote and then proceed to vote unanimously for removal, the removal vote would violate at least the spirit of the statute because two members would arguably be voting for removal based on no reason at all. That is not, however, this case. In this case, a majority of the Board found the Gene's Cafe incident charges to be proven, and all of the members found the Lydem incident charge to be proven. Every member of the Board thus found proven a violation on which removal could legitimately be based. Every member of the Board thereafter voted for removal. Under these circumstances, removal received "an affirmative vote of all five members" of the Board. The voting requirement of the 1953 special act was not violated.
III. CONCLUSION CT Page 7297
For the foregoing reasons, the appeal is dismissed. Dated at Waterbury this 12th day of August, 1991.
JON C. BLUE, Judge of the Superior Court